IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**KIMBERLY NICOLE FUSSELL and**
**DARRYL FUSSELL,** Individually and
as the Natural Parents of **DARRYL**
**LYNN FUSSELL, II;** and as Co-
Administrators of the **ESTATE OF**
**DARRYL LYNN FUSSELL,** their
deceased son **DARRYL LYNN**
**FUSSELL, II,**

   **Plaintiff,**

v.

**RANDY A. HALL, JR.,** in his Individual
Capacity as an Employee and Officer with
the Riverdale Police Department,
**ROBERT WEBBER**, in his Individual
Capacity as an Employee and Officer with
the Riverdale Police Department, and
**CITY OF RIVERDALE, Georgia,**

   **Defendants**.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CIVIL ACTION FILE NO:**
**_____**

*Jury Trial Demanded*

---

## **COMPLAINT FOR DAMAGES**

  **COME NOW** Plaintiffs, KIMBERLY NICOLE FUSSELL and DARRYL

LYNN FUSSELL, Individually and as the Natural Parents of DARRYL LYNN

FUSSELL II; and KIMBERLY NICOLE FUSSELL and DARRYL LYNN

FUSSELL, as Co-Administrators of the ESTATE OF DARRYL LYNN FUSSELL

II, and hereby file this complaint against Defendants RANDY A. HALL, JR., ROBERT WEBBER, and CITY OF RIVERDALE, showing this Court as follows:

## **INTRODUCTION**

1.

This is an action for damages arising from the tragic and preventable death of DARRYL LYNN FUSSELL II, (hereinafter "Darryl), who was shot and killed by a law enforcement officer from the City of Riverdale Police Department (hereinafter "RPD") At the time of this incident, Darryl was 23-years old and was under the care and treatment of Southern Regional Medical Center (SRMC), where he was transported for emergency medical care by Riverwoods Behavioral Health System of Atlanta, after being involuntarily committed for mental health evaluation and treatment. On April 13, 2023, Darryl absconded from SRMC and began wandering aimlessly around the city of Riverdale, which resulted in officers responding to a 911 call regarding a suspicious person. It was during this encounter with the police that Darryl was shot and killed by Defendant RANDY A. HALL.

## **JURISDICTION AND VENUE**

2.

This action is brought against Defendants RANDY A. HALL, JR., ROBERT WEBBER, and CITY OF RIVERDALE, pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the Constitution of the United States, as

applied to the State of Georgia. This action also contains state law claims against Defendants ROBERT WEBBER and RANDY A. HALL, JR. based on statutes and common law of the State of Georgia.

3.

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, 1337, 1343, and 1391. This is an action seeking damages greater than seventy-five thousand dollars ($75,000.00) exclusive of costs, interest, and attorney's fees. Plaintiff also invokes the supplemental jurisdiction of the Court to decide any asserted statutory and common law torts.

## **PARTIES**

4.

Plaintiffs, KIMBERLY NICOLE FUSSELL and DARRYL LYNN FUSSELL ("Plaintiffs"), file this action Individually and as the Natural Parents of DARRYL LYNN FUSSELL II, and as Co-Administrators of the ESTATE OF DARRYL LYNN FUSSELL II. Plaintiffs are residents of the State of Georgia, during all times material to the subject incident.

5.

Defendant, RANDY A. HALL, JR. (hereinafter "Officer HALL") during all times relevant to this action, was and is a police officer employed by Defendant CITY OF RIVERDALE, as an officer with RPD. The actions of Officer HALL,

which are the subject of this *Complaint for Damages* were undertaken in the regular course and scope of his employment as an officer with RPD. Officer HALL is sued in his individual capacity and, upon information and belief, resides at 119 Gardners Grove Drive, McDonough, Georgia, 30252, where he is subject to service of this lawsuit.

6.

Defendant, ROBERT WEBBER (hereinafter "Lieutenant WEBBER") during all times relevant to this action, was and is a police officer employed by Defendant CITY OF RIVERDALE, as an officer with RPD. The actions of Lieutenant WEBBER which are the subject of this *Complaint for Damages* were undertaken in the regular course and scope of his employment as an officer with RPD. Lieutenant WEBBER is sued in his individual capacity and, upon information and belief, resides at 7139 Highway 85, Riverdale, GA 30274,  where he is subject to service of this lawsuit.

7.

The actions of Officer HALL and Lieutenant WEBBER violated clearly established statutory and constitutional rights of which a reasonable officer would have known, including the Fourth Amendment of the United States Constitution and the United States Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985).

8.

Defendant CITY OF RIVERDALE, acting through its police department, was deliberately indifferent in its application of policies, practices, customs, and regulations of RPD, including hiring, training, supervision, and discipline. Acting through RPD, Defendant CITY OF RIVERDALE was responsible for promulgating all orders, rules, instructions, and standard operating procedures for citizen encounters with police officers acting in their official capacity.

9.

Defendant CITY OF RIVERDALE is a municipal corporation organized and existing under the laws of the State of Georgia and is responsible for the policies, practices, customs, and regulations, including hiring, training, supervision and discipline of agents, employees, and police officers of the RPD. Defendant CITY OF RIVERDALE may be served through its Mayor, Evelyn Wynn-Dixon, at 7200 Church St., Riverdale, GA 30274. Venue and jurisdiction are proper as to Defendant CITY OF RIVERDALE.

**STATEMENT OF FACTS**

10.

On April 13, 2023, Darryl was 23-years old and was under the care and treatment of Southern Regional Medical Center (SRMC), where he was transported

for emergency medical care by Riverwoods Behavioral Health System of Atlanta, after being involuntarily committed for mental health evaluation and treatment.

11.

On April 13, 2023, Darryl absconded from SRMC and began wandering aimlessly around the city of Riverdale, which resulted in RPD officers responding to a 911 call regarding a suspicious person.

12.

Soon after the City of Riverdale police officers encountered Darryl, Officer HALL shot Darryl multiple times while he knelt to pray.  As a result of multiple gunshot wounds, Darryl suffered severe injuries which ultimately led to his death on April 13, 2023, at approximately 6:30 p.m.

13.

The events relating to Darryl's shooting and death were investigated by the Georgia Bureau of Investigation (GBI).

## Darryl's Mental Health Crisis

14.

On April 10, 2023, Darryl was diagnosed with schizophrenia by doctors at Riverwoods Behavioral Health System (hereinafter "Riverwoods") after he reported hallucinating and suicidal ideations.

15.

Darryl was subsequently involuntarily committed at Riverwoods as an individual unable to care for their own physical health & safety and posing potential danger to themselves or others.

16.

While committed at Riverwoods, Darryl was prescribed a treatment plan of antidepressants, anti-anxiety and antipsychotic medications, and group therapy.

17.

On April 12, 2023, Darryl was found in a chair unresponsive by the Riverwoods medical staff and transported to the SRMC, where he was admitted as a patient for further evaluation.

18.

On April 13, 2023, at or about 2:50 p.m., Darryl absconded from SRMC and began wandering aimlessly around the Riverdale area.

19.

Shortly before 6:30 p.m. on the evening of the subject incident, Darryl entered a professional building construction site located at 6572 River Park Drive in Riverdale, Clayton County, Georgia.

20.

At the time of this incident, Officer HALL had been employed as a "Police Officer II" with RPD for less than six months, having been hired by RPD on December 14, 2022.

21.

Defendant CITY OF RIVERDALE's written job description for the position of "Police Officer II" requires an officer to possess the "[a]bility to analyze situations and to take quick, effective, and reasonable courses of action given due regard to the surrounding hazards and circumstances of each situation." See *City of Riverdale Job Description*, Page 2.

22.

For the position of "Police Officer II" Defendant CITY OF RIVERDALE requires that a "Police Field Training Officer, Police Sergeant, or Lieutenant reviews assignments and gives specific instructions and assistance when guidance or patrol backup is needed." *Id.*

23.

At the time of the events giving rise to this lawsuit, Lieutenant WEBBER was the "Field Training Officer" and supervisor for Officer HALL.

## Encounter Leading to Darryl's Shooting

24.

At approximately 6:30 p.m., Officer HALL and Lieutenant WEBBER were dispatched by RPD to respond to a call at 6572 River Park Drive regarding a suspicious person, who was later identified as Darryl.

25.

On the day of this incident, Officer HALL was on an overtime shift and had worked four (4) consecutive days of twelve-hour (12) shifts, having started his shift at 7am on the day of this incident and was scheduled to work until 7pm.

26.

Both Officer HALL and Lieutenant WEBBER prepared written reports of the events leading up to the shooting of Darryl and provided statements to the GBI.

27.

Alexander Horta-Avila, a construction supervisor, reported that someone had come into their work site at 6572 River Park Drive and would not leave.

27.

When they arrived at 6572 River Park Drive, Horta-Avila advised the officers that Darryl was still inside the building and directed them to Darryl's location.

28.

Before they encountered Darryl within the building, Officer HALL and Lieutenant WEBBER were advised by Horta-Avila that Darryl had entered the building, grabbed a hammer and began striking himself multiple times in the head, and then got into a praying position on the floor.

29.

Officer HALL reported to the GBI that based on the information provided to him by the 911 caller he recognized that Darryl may be an "emotionally disturbed person" and acknowledged that he saw an IV or intravenous line in Darryl's right arm which led him to conclude that Darryl "probably just recently left the hospital against doctor's recommendations."

30.

Despite Officer HALL's perception that Darryl was an "emotionally disturbed person" and reports that Officer HALL and Lieutenant WEBBER received that Darryl was observed hitting himself in the head multiple times with a hammer, Lieutenant WEBBER did nothing to assess Darryl's mental condition.

31.

RPD's Policy Manual "establish[es] policy and procedure regarding the interaction of employees with persons suffering from or suspected of suffering from

mental illness, and with persons with disabilities.  See *RPD.SOP.3084 Mentally Ill and Disabled Persons*, Para. 1, Page 1, attached as **Exhibit 1**.

32.

RPD's policy on interactions with mentally ill persons states that "[a]ll employees are responsible for complying with this directive" and "[s]upervisors are responsible for ensuring that employees are in compliance with this directive." *Id.* at Sections 3.2 and 3.3.

33.

RPD's Policy Manual states that "[m]ental illness refers to any of the various conditions characterized by impairment of an individual's normal cognitive, emotional, or behavioral functioning, cause by social, psychological, biochemical, genetic, or other factors, such as infection or head trauma." *Id.* at Section 4.1.1, at Page 2.

34.

RPD's Policy Manual states that "[p]ersons suffering from any of the severe mental disorders (illnesses) have a variety of symptoms that may include inappropriate anxiety, disturbances of thought and perception, dysregulation of mood, and cognitive disfunction." *Id.* at Section 4.1.3.

35.

According to RPD's Policy Manual, "[w]hen an officer receives a call or responds to a complaint concerning a mentally ill person, the officer's immediate supervisor will proceed directly to the location" and that "[i]n all case where the subject does not possess a Doctor's Certificate, the supervisor will make an evaluation and determine if it is necessary for the person to be taken into custody involuntarily." *Id.* at Section 4.6.2, Page 7.

36.

Officer HALL reported that as he approached Darryl, he "asked the subject what was going on to which he didn't reply" and "I then advised we were the Riverdale Police Department and again asked what was wrong" and "the subject again did not reply to me."

37.

Officer HALL reported that he "identified the subject by the color of his shirt by stating, "hey, green shirt what's going on?" and noticed "at this time the subject began moving."

38.

Officer HALL reported that as Darryl began to move, he at "first took this as him sitting up and acknowledging us" but "as I watched the subject, though, I began to realize he was moving to his left towards a toolbox and "once I realized the subject

was going for the toolbox, I ran up to him, pushed him away from it with both of my hands and told him to get away from it."

39.

Officer HALL reported that he attempted to retrieve his Taser "to tase him and allow Lt. Webber and I to detain him" but "the subject recovered too fast from the position I pushed him into" and "as he got back up, he went back into the toolbox."

40.

When questioned by the GBI regarding why he did not use his taser, Officer HALL stated that he was unable to use his taser due to the speed of the incident and reported to the GBI that his Taser was more difficult due to its location on his vest.

41.

Officer HALL also stated to the GBI that in his experience the taser is not always effective, recounting a prior incident where he deployed his taser and was not able to stop a subject - explaining that this is why he drew his firearm after his first attempt to retrieve his taser.

42.

Officer HALL reported that he "wasn't able to get him off in time and observed him attempting to grab something inside the toolbox" and "at this time I

began to creating distance between the subject and myself by backing up while I drew my department issued firearm."

43.

Officer HALL reported that "as I drew my firearm I observed the subject standing up with what I knew to be a pair of scissors in his right hand" and "before I could begin giving verbal commands to the subject to drop the scissors, he began running towards Lieutenant WEBBER and I with the scissors in his right hand and the linted end facing me."

44.

According to Lieutenant WEBBER, and contrary to Officer HALL's statement, they gave verbal commands to Darryl such as "drop the weapon" and "drop the knife", which Lieutenant WEBBER claims Darryl ignored.

45.

Officer HALL explained that "as my firearm aligned with the subject, I discharged my firearm" and "I continued discharging it until the threat ceased" and "the subject had fallen onto his back with the scissors still in his right hand."

46.

Darryl was shot seven times by Officer HALL.

47.

An autopsy performed on Darryl revealed the following gunshot wounds (GSW) to his body: two (2) GSW to his right anterior chest, one (1) GSW to his left anterior chest, one (1) GSW to the center chest, one (1) GSW to the upper posterior back, two (2) GSW to the left axillary, one (1) GSW to right forearm, and one (1) GSW to the left wrist.

48.

Lieutenant WEBBER reports that he drew his firearm but did not discharge it, reporting to the GBI that he was "getting ready to" discharge his drawn weapon, but did not fire because the incident happened so fast.

49.

Esquiber reported to the GBI that he observed Darryl hitting himself on the head with a hammer and took the hammer away from Darryl, prior to the police arriving.  Esquiber also reported that he called his cousin, Jose Romero, to talk to Darryl and that he and Romero were in the back when the police arrived.

50.

Romero reported to the GBI that Darryl walked into their worksite and grabbed one of their tools and a pair of white tennis shoes that he put on.  Romero reported that prior to when the police arrived, he and Esquiber, along with another worker, Alexander Horta-Avila, went to the back where Darryl was located.

51.

Horta-Avila reported to the GBI that he was supervising people working at 6572 River Park Drive, and received a call that a man had come onto the worksite, picked up one of their tools and began hitting himself.  Horta-Avila reported that when he arrived at the building, he saw the male kneeling on the ground like he was praying.

52.

Horta-Avila reported that there was one white officer (Officer HALL) and one black (Lt. Webber) who tried to talk to the male (Darryl), but he did not respond. Horta-Avila reported that the white officer then said something to the effect of "green shirt: and the guy (Darryl) stood up, and the white officer pushed the guy down.  According to Horta-Avila, the guy went to one of their toolboxes and retried a pair of scissors and moved towards the officer, at which point Horta-Avila reported that he backed down the hallway.

**RPD's Policies and Procedures**

53.

Defendant CITY OF RIVERDALE vests the executive and administrative powers of its municipal government in its Mayor and Council, who have the

authority to create a City Manager to implement the policies of the mayor and council.

54.

Defendant CITY OF RIVERDALE'S chief of police is answerable to the city manager and is responsible for "establishing the organizational structure of the Department" and is "the chief executive officer of the Department" with "the authority and responsibility to manage, direct and control the operations and administration of the Department." *Riverdale Police Department Policy Manual, RPD.SOP.1010.R3, Mission and Organization of the Department, Section 3.11.3, Chief Executive Officer,* attached hereto as **Exhibit 2**.

55.

The chief of police of RPD "is responsible for administering and managing" the department, including the Patrol Bureau, and "exercises command over all personnel in the Department." *Id.*

56.

The mayor, council, city manager, and chief of police and his command are ultimately responsible for ensuring that RPD officers comply with the color and pretense of federal and state laws, as well as the ordinances, regulations, customs, usages of the State of Georgia and the City of Riverdale, and the policies of the RPD.

57.

The chief of police and his command are ultimately responsible for the policies, practices, customs, and regulations of RPD, including the recruitment and hiring of officers. RPD's policy on "Recruitment and Hiring" establishes "the procedure for investigating the background of applicants for employment with the Riverdale Police Department" which includes "Ineligibility Guidelines" such as performance evaluations, terminations, disciplinary history, and pending disciplinary investigations. See *RPD.SOP.2070, Recruitment and Hiring Process*, attached hereto as **Exhibit 3**.

58.

The Chief of Police of RPD and his command are ultimately responsible for the effective and professional administration of the disciplinary process within RPD, including investigating all allegations of employee misconduct and imposing appropriate disciplinary actions. The Chief of Police retains the authority to review, revoke, or modify any disciplinary actions taken by any supervisor in the Department.

59.

The chief of police of RPD and his command are also ultimately responsible for training, supervision, and discipline of RPD officers, and for promulgating all

orders, rules, instructions, and standard operating procedures for citizen encounters with police officers acting in their official capacity.

60.

Employees of RPD are expressly prohibited from unnecessary or unreasonable use of force against any person or property. RPD officers' use of force is gauged by the standard set forth in *Graham v. Conner*, 490 U.S. 386 (1989). <u>See</u> *RPD.SOP.2010.R1, Work Rules, Section 4.50.2, Maltreatment or Unnecessary Force*, attached hereto as **Exhibit 4**.

61.

In *Graham*, the United States Supreme Court determined that all claims that law enforcement officials have used excessive force during an arrest, investigatory stop or other "seizure" of a person, should be analyzed under the "objective reasonableness, standard of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. *Graham*, 490 U.S. 386 at 396.

62.

In determining whether an officer's use of is reasonable, the standard is whether a reasonable officer would believe that his level of force is necessary in the situation at hand, which required balancing the "nature and quality of the intrusion" against the "governmental interest at stake." *Graham*, 490 U.S. at 396.

63.

Because the Fourth Amendment protects citizens from "unreasonable" seizures, the use of deadly force must be reasonable under the circumstances, thus, using deadly force in a situation that clearly would not justify its use is unreasonable under the Fourth Amendment. Deadly force cannot be employed in a situation that requires less-then-lethal force. *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Moreover, a seizure that occurs by means of deadly force is unmatched. *Id.*

64.

In determining whether Officer HALL's force was reasonable, the totality of the circumstances must be examined, including the "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 3.

65.

RPD also has a use of force policy that applies to all sworn officers of the department, which proves, in pertinent part, as follows:

> The Riverdale Police Department recognizes and respects the value of human life and the right of people to be secure in their persons and property. Sworn employees in the performance of their duties, encounter situations where the use of force reasonably appears necessary to affect an arrest or detention, overcome resistance, control a subject, or protect themselves or others from injury or death will only use that force which is reasonable and necessary in order to accomplish lawful objectives.

*Policy RPD.SOP.3010.R3, Use of Force*, attached hereto as **Exhibit 5**.

66.

RPD officers are only authorized to use deadly force where they reasonably believe a suspect possesses a weapon capable of inflicting death or serious bodily injury; they reasonably believe a suspect poses an imminent threat of danger to the officer or others; or there is probable cause to believe that a fleeing suspect has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer believes that the escape of the suspect would pose an imminent danger of death or serious physical harm. *RPD.SOP.3010.R3, Use of Force*, Section 4.2, *Use of Deadly Force*; see also *RPD.SOP.2010.R1, Work Rules*, Section 4.6.09.

67.

RPD's policy on "Weapons" requires that "employees should only carry and use City-issued and/or authorized lethal and non-lethal weapons after demonstrating proficiency in their use, including demonstrating a knowledge of the laws concerning the use of authorized weapons and knowledge of Department policy on the use of force, escalating force, and deadly force." *RPD.SOP.3040.R3, Weapons*, attached hereto as **Exhibit 6**; see also *RPD.SOP.3010.R3, Use of Force*, Section 4.4, *Lethal and Non-Lethal Weapons*.

21

## **RPD's Hiring Officer Hall**

68.

Prior to this incident, and before Officer HALL was hired by RPD, Officer HALL was the subject of numerous disciplinary actions by his previous employer, Clayton County Police Department (sometimes referred to as "CCPD"), for conduct by him in violation of their police department regulations, policies, and procedures.

69.

Officer HALL's disciplinary history was known by RPD, as reflected in his officer application, where Officer HALL admitted that he was terminated from the CCPD prior to the end of his probationary period and later denied employment from the Henry County Police Department, the Fairburn Police Department, and the Georgia State Patrol based on his work history; in 2017, Hall was also previously rejected as an applicant by RPD.

70.

During his employment at CCPD, Officer HALL faced four Internal Investigation complaints—three for his demeanor, and one for his use of force—all of which were sustained.

71.

On December 14, 2018, during his career as an CCPD officer, Officer HALL was issued a "General Counseling" Form by his supervisor for excessive use of force

and failure to use restraint.

72.

The December 2018 "General Counseling" reprimands Officer HALL for excessive force through use of his taser to a passively resistant subject; for failing to assess the subject's pain when his initial use of the taser did not subdue them; for directing profanities at the subject; for threatening to break the subject's arm; and for causing a hostile environment.

73.

On December 14, 2018, Officer HALL received a second ""General Counseling" Form", relating to another incident during his employment with CCPD, for failure to use restraint and failure to activate his body worn camera (BWC).

74.

The second "Letter of Counseling" reprimands Officer HALL for his poor demeanor towards a citizen during a traffic stop, including tossing the subject's driver's license at her as the stop concluded.

75.

After over two years on a probationary status with the CCPD, and as the result of the two sustained complaints against him on December 14, 2018, and a third sustained against him on January 25, 2019, for poor demeanor and apathy towards citizens, Officer HALL was terminated.  Officer HALL's fourth sustained complaint

was filed on February 26, 2019, after he had been fired from CCPD.

76.

After Officer HALL's employment at CCPD, he worked for the Palmetto Police Department (sometimes referred to as "PPD") from June 2019 through March 2022. During his employment with PPD, Officer HALL was promoted from "Peace Officer" to "Corporal" but within six months he was demoted back to "Peace Officer."

77.

On October 5, 2022, Officer HALL applied to the Riverdale Police department completing an application where he noted his prior employment with the Clayton County and Palmetto Police Departments and explained that he left that position because he "terminated and was seeking employment."

78.

While reviewing Officer HALL's application, RPD reached out to his direct supervisor at CCPD and was informed that Officer HALL exhibited poor cooperation with management, poor honesty, poor discipline, poor productivity, poor ability to follow instructions, poor stress management, a poor rapport with co-workers, and a poor rapport with the public.

79.

Officer HALL's hiring process was overseen by a hiring board comprised of RPD's assistant chief of police and other high ranking RPD officials, who recommended to hire Officer HALL because he scored well and "was well-groomed."

80.

Despite his poor performance evaluations and adverse disciplinary file, on December 13, 2022, Defendant CITY OF RIVERDALE, acting through its chief of police, decided to hire Officer HALL.

81.

Since Officer HALL was hired by RPD, he has been the subject of numerous disciplinary reviews for conduct by him in violation of RPD regulations, policies, and procedures, including tasing a 17-year-old boy for walking away from him and multiple instances of failing to exercise due regard for citizens.

82.

As a direct and proximate result of the actions of Defendants Officer HALL, Lieutenant WEBBER, and the CITY OF RIVERDALE, Darryl's clearly established state and federal statutory and constitutional rights were violated, which resulted in Darryl experiencing physical injury and pain, emotional and psychological trauma,

and eventually being deprived of his life when he was shot multiple times by Officer HALL.

83.

As a direct and proximate result of Officer HALL's unreasonable, unnecessary and excessive force by shooting Darryl seven times, Officer HALL violated Darryl's clearly established state and federal statutory and constitutional rights.

84.

As a direct and proximate result of Lieutenant WEBBER failing to adequately supervise and oversee the actions of Officer HALL, including his failure to conduct a mental health assessment of Darryl, and failing to intervene to prevent Officer HALL from shooting Darryl seven times, Lieutenant WEBBER violated Darryl's clearly established state and federal statutory and constitutional rights.

85.

Defendant CITY OF RIVERDALE, acting through its police department, including supervisors and command staff within RPD, have acted willfully, wantonly, recklessly, and with deliberate indifference towards the constitutional rights of citizens, including Darryl, to be free from excessive and unreasonable force in violation of the Fourth Amendment.

86.

Defendant CITY OF RIVERDALE, acting through its police department, has exhibited a pattern and practice of deliberate indifference towards the constitutional rights of citizens, by negligently hiring, training, supervising, and disciplining their employees, which was the direct and proximate cause of Darryl's death.

**PART I**
**(Violation of 42 U.S.C. § 1983 and State Law Claims)**
**(Against Defendant RANDY A. HALL, JR.,**
**in his Individual Capacity)**

87.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

## <u>FOURTH AMENDMENT VIOLATION</u>

88.

Officer HALL is a "person" under 42 U.S.C. § 1983 and during all times relevant was acting under color of law as a police officer with RPD.

89.

As an officer with RPD, Officer HALL is vested with the authority and duty to protect life and property, prevent crime, detect, arrest, prosecute offenders, preserve the public peace, and enforce the laws of the state of Georgia and local municipalities, ordinances, as well as the policies and procedures of RPD.

90.

Officer HALL, while acting under color of law and with the authority of RPD, negligently, recklessly, and intentionally acted in a manner that deprived Darryl of his constitutional rights, including his rights under the Fourth Amendment of the United States Constitution.

91.

Officer HALL had a duty and responsibility to carry out his law enforcement duties with a reverence for the sanctity of human life, and to use only that force, which is necessary, proportional to the level of resistance, and objectively reasonable based on the totality of circumstances confronting him.

92.

Officer HALL had a duty and responsibility to take all reasonable measures to de-escalate an incident and reduce the likelihood or level of force that is not necessary, proportional, and objectively unreasonable and does not reflect reasonable de-escalation efforts.

93.

The use of force is regulated by state and federal law and is not left to the unregulated discretion of the officer, and thus a use of force decision is dictated by the actions of the resistant or combative subject, the law, RPD policy, proper tactics, and training.

94.

Officer HALL was only authorized to use the amount of force necessary to achieve a lawful objective, and which was objectively reasonable, given the facts and circumstances perceived by the officer at the time of the use of force, to accomplish a legitimate law enforcement purpose.

99.

Officer HALL was only authorized to use deadly force by shooting Darryl seven times if he had an objectively reasonably belief that deadly force was necessary to protect himself or others from what he reasonably believes is an imminent threat of death of serious bodily injury.

100.

At the time Officer HALL shot seven times striking Darryl, he did not have an objectively reasonable basis to believe that Darryl posed an imminent threat of serious bodily injury or death to him or any other person.

101.

The actions of Officer HALL in shooting and striking Darryl seven times were in violation of Darryl's right to be free from an unreasonable seizure and restraint on his liberty without due process, in violation of state and federal law, and the Fourth Amendment of the United States Constitution.

## STATE LAW CLAIMS

102.

Officer HALL's intentional unjustified shooting of Darryl, resulted in Darryl being shot multiple times and placed in fear, which gives rise to state law claims and liability for assault and battery.

103.

Because the actions of Officer HALL were intentional, extreme, outrageous, and reckless, causing Darryl to experience severe emotional distress, Officer HALL's conduct gives rise to liability to Plaintiff's for intentional infliction of emotional distress.

104.

The actions of Officer HALL in shooting Darryl multiple times was not only without legal justification, but was done with actual malice toward Darryl, and with willful and wanton indifference, and deliberate disregard for their constitutional rights, entitling them to exemplary damages, pursuant to O.C.G.A. § 51-12-5.1.

105.

Officer HALL is not entitled to qualified immunity, because his actions were malicious, reckless, and callously indifferent to clearly established and well-settled federal and state constitutional and statutory law, which a reasonable person in his position would have known.

106.

The actions of Officer HALL in shooting Darryl multiple times, was not only without legal justification but was due to Officer HALL's negligent performance of his ministerial duties as defined and required by Georgia law, and therefore no state immunity applies in this matter.

107.

Officer HALL's actions and omissions, including his use of excessive and unreasonable deadly force against Darryl was the direct and proximate cause of Darryl's personal injury and death, which entitles Plaintiffs to recover for the full value of their son's life as defined under O.C.G.A. Section 51-4-2(a). such as medical, funeral and burial expenses.

108.

As a direct and proximate result of the actions of Officer HALL, he is liable to Plaintiffs for Darryl's conscious pain and suffering experienced prior to his death, along with damages for his medical, funeral and burial expenses.

**PART II**
**(Violation of 42 U.S.C. § 1983 and State Law Claims)**
**(Against Defendant ROBERT WEBBER,**
**in his Individual Capacity)**

109.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

## FOURTH AMENDMENT VIOLATION

### 110.

Lieutenant WEBBER is a "person" under 42 U.S.C. § 1983 and during all times relevant was acting under color of law as a police officer with RPD.

### 111.

As an officer with RPD, Lieutenant WEBBER is vested with the authority and duty to protect life and property, prevent crime, detect, arrest, prosecute offenders, preserve the public peace, and enforce the laws of the state of Georgia and local municipalities, ordinances, as well as the policies and procedures of RPD.

### 112.

Lieutenant WEBBER had a duty and responsibility to carry out his law enforcement duties with reverence for the sanctity of human life, including a duty to intervene to protect Darryl from Officer HALL's use of excessive and unreasonable force in violation of the Fourth Amendment.

### 113.

It is well settled law within the Eleventh Circuit that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for failing to intervene, so long as he was able to intervene yet failed to do so.  See *Hadley v. Gutierrez*, 526 F.3d 1324,

1330-1331 (11th Cir. 2008) and *Alston v. Swarbrick*, 954 F.3d 1312, 1321 (11th Cir. 2020).

114.

Lieutenant WEBBER, while acting under color of law and with the authority of RPD, failed to intervene to prevent Officer HALL's use of excessive force against Darryl, by failing to take reasonable steps to protect Darryl from being shot seven times, despite having an opportunity to intervene.

115.

Lieutenant WEBBER is not entitled to qualified immunity, because his actions violate clearly established and well-settled federal and state constitutional and statutory law, and policies of RPD.

## **STATE LAW CLAIMS**

116.

Because the actions of Lieutenant WEBBER were intentional, extreme, outrageous, and reckless, causing Darryl to experience severe emotional distress, Lieutenant WEBBER's conduct gives rise to liability to Plaintiff's for intentional infliction of emotional distress.

117.

Lieutenant WEBBER's failure to adequately supervise and oversee the actions of Officer HALL as required by the policies of RPD, including his failure to

conduct a mental health assessment of Darryl, and failing to intervene to prevent Officer HALL from shooting Darryl seven times, are violations of his ministerial duties as defined under Georgia law and the policies and procedures of RPD.

118.

Lieutenant WEBBER's actions and omissions, as described above, was the direct and proximate cause of Darryl's personal injury and death, which entitles Plaintiffs to recover for the full value of their son's life as defined under O.C.G.A. § 51-4-2(a). such as medical, funeral and burial expenses.

119.

As a direct and proximate result of the actions of Lieutenant WEBBER, he is liable to Plaintiffs for Darryl's conscious pain and suffering experienced prior to his death, along with damages for his medical, funeral and burial expenses.

**PART III**
**(*42 U.S.C. §* 1983 – Municipal Liability)**
**(Defendant City of Riverdale)**

120.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

121.

Defendant CITY OF RIVERDALE can be held liable for the violation of Darryl's federal constitutional rights, pursuant to 42 U.S.C. §1983, *Monell v. Dept.*

*of Soc. Serv.,* 436 U.S. 658 (1978), and *City of Canton Ohio v. Harris*, 489 U.S. 378 (1989), as well as related state and federal cases which hold that municipalities can be held liable for deliberate indifference to hiring, training, supervising and disciplining police officers, where said deliberate indifference is the direct and proximate cause of the violation of the constitutional rights of citizens to be free from unreasonable and excessive force.

122.

Defendant CITY OF RIVERDALE vests the executive and administrative powers of its municipal government in its mayor and directors of the departments of City government.

123.

The mayor, council, city manager, chief of police, and supervisors within the RPD are responsible for administering and managing the police department, including its patrol officers such as Officer HALL.

124.

The chief of police of RPD and his command are ultimately responsible for ensuring that RPD officers complied with the color and pretense of federal and state laws, as well as the ordinances, regulations, customs, usages of the State of Georgia, the City of Riverdale, and the policies of RPD.

125.

The chief of police and his command are ultimately responsible for the policies, practices, customs, and regulations of RPD, including the recruitment and hiring of officers, which includes identifying and assessing patterns of past behavior, severity of behavior, probable consequences if past behavior is repeated or made public, likelihood of recurrence, and relevance of past behavior to public safety employment.

126.

The chief of police and his command are also ultimately responsible for training, supervision, and discipline of RPD officers, and for promulgating all orders, rules, instructions, and standard operating procedures for citizen encounters with police officers acting in their official capacity.

127.

Defendant CITY OF RIVERDALE, through its chief of police, and supervisors within RPD, had actual and constructive knowledge of deficiencies in the qualifications and experience of Officer HALL to serve as a police officer as set forth herein.

128.

Despite having a policy regarding *Mentally Ill and Disabled Persons*, created and implemented by RPD as early as 2007, Defendant CITY OF RIVERDALE failed to ensure that Officer HALL received training and instruction on this policy. See *RPD.SOP.3084 Mentally Ill and Disabled Persons*, attached as **Exhibit 1**.

129.

According to RPD's Training policy, "[t]he Riverdale Police Department will provide or make available to employees training that is required by Georgia POST, the City of Riverdale, and the Department, as well as any other necessary training, to ensure the effective and efficient operation of the Department," along with "training to allow employees to obtain the knowledge, skills, and abilities to provide a safe and secure environment for the City of Riverdale." *RPD.SOP.2080.R5, Training*, Section 2, at Page 1, attached hereto as **Exhibit 6**.

130.

Having actual and constructive knowledge of deficiencies in Officer HALL's qualifications and experience, Defendant CITY OF RIVERDALE, through its chief of police, and supervisors within RPD, knew or should have known, and were deliberately indifferent to knowledge and information that Officer HALL was not suitable for employment as a law enforcement officer.

131.

Defendant CITY OF RIVERDALE, acting through its chief of police and police department, was aware upon hiring Officer HALL that he required extended field training and scenario-based training, specifically relating to the use of firearms, and training relating to interactions with mentally ill and disabled persons.

132.

Officer HALL's Peace Officer Standards and Training Council (POST) profile reflects that at no point in his law enforcement career has he received any training on dealing with mentally ill and diminished capacity individuals, while Lieutenant WEBBER's POST profile shows that he received this training on multiple occasions, the most recent being December 1, 2018.

133.

Despite constructive and actual knowledge that Officer HALL needed extensive training and supervision to perform as a patrol officer in the field, Defendant CITY OF RIVERDALE, through its police department, failed to provide Officer HALL with the degree of training and supervision needed.

134.

By failing to adequately scrutinize Officer HALL's prior law enforcement background and failing to provide Officer HALL with adequate supervision and training, Defendant CITY OF RIVERDALE was deliberately indifferent to the

obvious risk that Officer HALL would violate the constitutional rights of citizens, including Darryl.

135.

The deliberate indifference of Defendant CITY OF RIVERDALE, through its policy makers and police department, as described herein, was the moving force and cause of Officer HALL's shooting and killing Darryl, in violation of his Fourth Amendment rights.

136.

As a direct and proximate result of the actions of Defendant CITY OF RIVERDALE is liable to Plaintiffs for all damages allowed under Georgia and federal law, including wrongful death, and damages for physical and emotional pain and suffering prior to Darryl's death, as well as funeral, burial and medical expenses resulting from this incident.

**PART III**
**(Wrongful Death and Estate Claims Under Georgia Law)**
**(All Defendants)**

137.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

39

138.

As the direct and proximate result of the joint and several negligence of all Defendants, Darryl suffered catastrophic personal injury, physical and emotional pain and suffering, and economic loss from the time he was shot and killed until his death.

139.

As the direct and proximate result of the joint and several negligence of all Defendants, the Estate of DARRYL LYNN FUSSELL II is entitled to receive damages for Darryl's conscious pain and suffering and medical expenses incurred from his injuries prior to his death, and his funeral expenses.

140.

As a direct and proximate result of the actions and omissions of Defendants, as described hereon, Plaintiffs are entitled to recover damages against them for Darryl's physical and emotional pain and suffering, and for all damages allowed under Georgia law for his wrongful death.

**WHEREFORE**, Plaintiffs pray for a judgment against Defendants as follows:

a)      That process issue and that Defendants be served according to the law;

b)      That Plaintiffs have a trial by jury;

c)      That Plaintiffs have and recover a verdict and judgment against Defendants for all compensatory, general, and punitive damages, as alleged in this lawsuit and allowed under Georgia law, and for reasonable attorney fees pursuant to 42 U.S.C. § 1988, and for all such amounts as may be proven before the trier of fact; and

d)      That Plaintiffs have such other and further relief as this Court deems just and proper under the circumstances.

Respectfully submitted this $\underline{11^{th}}$ day of April, 2025.

**THE COCHRAN FIRM - TLANTA**

*/s/ Shean D. Williams*

Jane Mary Lamberti, Esq.
Georgia Bar No. 432025
Shean D. Williams, Esq.
Georgia Bar No. 764139
Samuel L Starks, Esq.
Georgia Bar No. 676515
***Attorneys for Plaintiffs***

100 Peachtree Street, N.W., Suite 2600
Atlanta, GA 30303
T: (404) 222-9922/F: (404) 222-0170
E:      jlamberti@cochranfirmatl.com
        swilliams@cochranfirmatl.com
        sstarks@cochranfirmatl.com

**KEVIN A. ADAMSON, P.C.**

*/s/ Kevin A. Adamson*
Kevin A. Adamson, Esq.
Georgia Bar No. 004851
De'Andrea N. Byrd, Esq.
Georgia Bar No. 835407
***Attorneys for Plaintiffs***

Gwinnett Commerce Center
3700 Crestwood Parkway
Suite 600
Duluth, GA 30096
T: (404) 581-9100
F: (404) 581-9111
E: kevin@kaapc.com
   deandrea@kaapc.com