UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KIMBERLY NICOLE FUSSELL, et
al.,

         Plaintiffs,

   v.

RANDY A. HALL, JR., et al.,

         Defendants.

CIVIL ACTION NO.
1:25-CV-01993-JPB

## ORDER

This matter is before the Court on Officer Randy Hall, Officer Robert
Webber and the City of Riverdale's (collectively, "Defendants") Motion for
Judgment on the Pleadings [Doc. 13]. This Court finds as follows:

## BACKGROUND

This case arises from the tragic death of Darryl Lynn Fussell II
("Decedent"), who was fatally shot by Officer Hall, a police officer employed by
the City of Riverdale Police Department. On April 11, 2025, Kimberly Nicole
Fussell and Darryl Lynn Fussell (collectively, "Plaintiffs") brought suit against
Defendants. Plaintiffs asserted an excessive force in violation of the Fourth
Amendment claim and various state law claims against Officer Hall. As to Officer
Webber, Plaintiffs brought a constitutional claim for failure to intervene and a state

law claim for intentional infliction of emotional distress.  Plaintiffs also set forth a deliberate indifference claim pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), against the City of Riverdale.

Defendants filed their answer on June 20, 2025.  [Doc. 10].  Defendants attached several exhibits to their answer, including the bodycam recordings from Officers Hall and Webber and the Investigative Case Summary prepared by the Georgia Bureau of Investigation ("GBI").  [Docs. 10-1, 10-2 and 10-3].  Shortly thereafter, Defendants filed the instant Motion for Judgment on the Pleadings. [Doc. 13].

Before reaching the merits of Defendants' Motion for Judgment on the Pleadings, the Court must first decide whether it can consider the bodycam recordings[1] attached to Defendants' answer.  As a general rule, courts are not permitted to look beyond the pleadings when deciding a Rule 12 motion.  Johnson v. City of Atlanta, 107 F.4th 1292, 1298 (11th Cir. 2024).  The "incorporation by reference" doctrine, however, is an exception to this general rule.  Id.  Under this doctrine, when resolving a motion for judgment on the pleadings, a court may consider a document not referred to or attached to a complaint if the document is

---

[1] Because the bodycam recordings are dispositive in this matter, the Court need not analyze whether the Investigative Case Summary can be incorporated by reference.  The Court did not consider that document.

"(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." Id. at 1300.  Plaintiffs assert that neither requirement is satisfied here.

Pursuant to the rule stated above, the Court must first analyze whether the bodycam recordings are central to Plaintiffs' claims.  The bodycam recordings, which contain both visual and audio depictions of the shooting, show the entire encounter between Decedent and Officers Hall and Webber.  Indeed, the bodycam recordings capture the moment the two officers arrived on scene and spoke to a witness and the initial contact with Decedent where Decedent refused to acknowledge the two officers in any way.  The bodycam recordings also show the exact moment that Decedent stood up, bent back down for a weapon despite instructions to "stay away from that" and began quickly moving towards Officer Hall.  Finally, the bodycam recordings capture the shooting from two different angles.  These events are clearly "central" to Plaintiffs' claims.

Plaintiffs argue that the centrality requirement is not satisfied because the recordings fail to show all the relevant conduct.  Specifically, Plaintiffs contend that neither recording captures a clear image of Decedent "charging" or "lunging" at Officer Hall while holding a pair of scissors.  [Doc. 20, p. 11].  The Court disagrees.  Review of the bodycam recordings demonstrate that after Decedent

grabbed the scissors, he began moving towards Officer Hall.  Ultimately, because the bodycam recordings depict the events central to Plaintiffs' constitutional claims and show all the relevant conduct, the centrality requirement is satisfied.

In order to consider the recordings pursuant to the incorporation by reference doctrine, the Court must also find that the authenticity of the evidence is not challenged.  In this case, Plaintiffs nominally challenge the authenticity of the recordings by stating that they have had "no opportunity to independently examine the videos, or to depose any officials regarding their authenticity."[2]  Id. at 10.  This is not sufficient to dispute the authenticity of the recordings because Plaintiffs never argue that the recordings have been altered in any way.  See Baker v. City of Madison, 67 F.4th 1268, 1277 (11th Cir. 2023) (holding that the plaintiffs did not properly contest the authenticity of the footage where there were "no allegations or indications that the footage [had] been altered in any way").  Moreover, the Court "sees nothing in the record to suggest that [Plaintiffs] actually" believe that the bodycam recordings are not what they purport to be.  Howard v. DeKalb County, No. 1:22-CV-1550, 2023 WL 2782315, at *4 (N.D. Ga. Mar. 1, 2023); see also Venisee v. Miami-Dade County, No. 25-cv-20024, 2025 WL 1529683, at *3 (S.D.

---

[2] Plaintiffs also argue that the record is devoid of a certificate of authenticity from RPD. This argument is moot because Defendants have now submitted certified copies of the recordings.  [Doc. 26].

Fla. May 28, 2025) (holding that the plaintiff failed to "meaningfully" challenge the authenticity where the plaintiff only used "conclusory catchphrases like 'unverified' and 'contested' to describe the video" and never actually argued that the videos were altered or that they did not depict what actually happened). Ultimately, because the record lacks any suggestion that the bodycam recordings were altered or fail to depict what actually happened, the Court finds that the authenticity of the recordings is not challenged.

To summarize, the Court finds that the recordings are central to Plaintiffs' claims and that their authenticity is not challenged.  Thus, the requirements of the incorporation by reference doctrine are satisfied.  As such, the Court will consider the bodycam recordings in resolving the instant motion.

## FACTS

The relevant facts, as presented by Plaintiffs' Complaint and as depicted on the bodycam recordings, are as follows:

On April 10, 2023, Decedent, who had recently been diagnosed with schizophrenia, was involuntarily committed to Riverwoods Behavioral Health System as an individual unable to care for his own physical safety and posing a potential danger to himself or others.  [Doc. 1, pp. 6–7].  On April 12, 2023,

Riverwoods transferred Decedent to Southern Regional Medical Center.  Id. at 7.

The next day, on April 13, 2023, Decedent absconded from the hospital.  Id.

Shortly before 6:30 PM on the day that Decedent absconded, 911 was called

after Decedent entered into a building construction site in Riverdale, Georgia.  Id.

Two officers from the Riverdale Police Department ("RPD") responded:  Officer

Hall,[3] who had been employed with RPD for less than six months, and his field

training officer, Officer Webber.  Id. at 8–9.  When they arrived on the scene, a

construction supervisor told them that Decedent had come into their work site and

would not leave.  Id. at 9.  The construction supervisor also informed them that

Decedent had grabbed a hammer and had struck himself in the head multiple times

before getting into a praying position on the floor.  Id. at 10.

The bodycam recordings show that both officers proceeded into the building

and immediately initiated contact with Decedent, who was still crouched on the

floor.  [Docs. 10-1 and 10-2].  While standing close to Decedent, Officer Hall

stated, "Hey bossman, Riverdale PD, what's going on?"  [Doc. 10-1 at 1:09-1:11].

Decedent remained on the floor and did not respond.  Id. at 1:11-1:16.  A couple of

---

[3] The Complaint contains numerous allegations regarding RPD's hiring of Officer Hall.
According to Plaintiffs, RPD knew that Officer Hall was the subject of multiple
disciplinary actions while he was employed by the Clayton County Police Department.
[Doc. 1, pp. 22–25].  Plaintiffs further alleged that RPD internally investigated Officer
Hall after he tazed a child who was walking away from him.  Id. at 25.

seconds later, Officer Hall again attempted to speak with Decedent by saying, "hey

Riverdale PD, what's going on?" Id. at 1:16-1:17. Like before, Decedent did not

respond. Id. at 1:17-1:20. Officer Webber then stated, "hey man, you can talk to

us," which was immediately followed by Officer Hall stating, "green shirt, black

pants, what's going on?" Id. at 1:20-1:25. Instead of responding, Decedent got to

his feet and moved towards a toolbox. Id. at 1:25. In a commanding voice, Officer

Hall moved closer to Decedent and said, "hey stay away from that, stay away from

that, hey stay away from that!" Id. at 1:26-1:27. Decedent, however, looked right

at Officer Hall and reached down for the toolbox. Id. at 1:27-1:29. Notably,

Officer Hall attempted to push Decedent away from the toolbox, but Decedent kept

reaching for it. Id. at 1:29-1:30. Conveying to Decedent that he needed to stop

what he was doing, Officer Hall yelled "hey" two more times in a raised voice. Id.

at 1:30. Ultimately, Decedent successfully obtained a pair of scissors from the

toolbox, which caused Officer Hall to retreat and draw his weapon. Id. at 1:31-

1:33. When Decedent began moving towards Officer Hall with the scissors in his

hand, Officer Hall shot Decedent seven times without issuing a warning.[4] Id. at

1:34-1:36. Decedent died from his injuries.

---

[4] The Court notes that the entire encounter—from the time of first contact until the
shooting—lasted twenty-five seconds. More specifically, from the time Decedent
reached down for the toolbox until he began moving towards Officer Hall, only five
seconds elapsed. The shots were fired over a span of just two seconds.

## LEGAL STANDARD

A party may move for judgment on the pleadings under Rule 12(c) of the
Federal Rules of Civil Procedure once the pleadings are closed but early enough to
avoid delaying trial.  "Judgment on the pleadings is appropriate where there are no
material facts in dispute and the moving party is entitled to judgment as a matter of
law." Cannon v. City of W. Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001).
When determining whether a party is entitled to judgment on the pleadings, a
district court must "accept as true all material facts alleged in the non-moving
party's pleading" and "view those facts in the light most favorable to the non-
moving party." Perez v. Wells Fargo N.A., 774 F.3d 1329, 1335 (11th Cir. 2014).
A motion for judgment on the pleadings under Rule 12(c) poses the same question
as that presented by a motion to dismiss under Rule 12(b)(6):  whether the
complaint states a claim for relief.  Strategic Income Fund, LLC v. Spear, Leeds &
Kellogg Corp., 305 F.3d 1293, 1295 n.8 (11th Cir. 2002).

## DISCUSSION

Defendants assert that they are entitled to judgment on the pleadings for
several different reasons.  In the analysis below, the Court will first analyze
whether Officers Hall and Webber are entitled to qualified immunity as to the
federal claims asserted against them.  Then, the Court will address Plaintiffs'

Monell claim pertaining to the City of Riverdale.  Finally, the Court will discuss

Plaintiffs' state law claims.

**I.    Federal Claims as to Officers Hall and Webber**

In their Motion for Judgment on the Pleadings, Defendants argue, among

other things, that they are entitled to qualified immunity as to the federal claims.

The defense of qualified immunity is ordinarily addressed at the summary

judgment stage of a case.  Chesser v. Sparks, 248 F.3d 1117, 1121 (11th Cir.

2001).  Nevertheless, the Eleventh Circuit Court of Appeals has held that it may be

raised and considered earlier.  St. George v. Pinellas County, 285 F.3d 1334, 1337

(11th Cir. 2002).  In fact, because qualified immunity is a "'defense not only from

liability, but also from suit, it is important for a court to ascertain the validity of a

qualified immunity defense as early in the lawsuit as possible.'"  Paez v. Mulvey,

915 F.3d 1276, 1284 (11th Cir. 2019) (quoting Lee v. Ferraro, 284 F.3d 1188, 1194

(11th Cir. 2002)).

As a general principle, "[q]ualified immunity protects public officers 'from

undue interference with their duties and from potentially disabling threats of

liability.'"  Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982)).

Specifically, qualified immunity shields "government officials 'performing

discretionary functions . . . from liability for civil damages insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting Harlow, 457 U.S. at 818). Crucially, qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

"[T]o establish qualified immunity, a defendant must first show that [he] was acting within the scope of [his] discretionary authority at the time of the alleged misconduct."[5] Paez, 915 F.3d at 1284. Once a defendant makes the required showing, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id. An arresting officer is entitled to qualified immunity unless the plaintiff shows that: (1) the defendant violated a constitutional right; and (2) the violated right was clearly established at the time of the incident. Id. "'Both elements of this test must be present for an official to lose qualified immunity.'" Rivera v. Carvajal, 777 F. App'x 434, 437 (11th Cir. 2019) (quoting Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010)).

In the analysis below, the Court will first analyze whether Officer Hall is entitled to qualified immunity.

---

[5] In this case, no one disputes that either officer was acting within the scope of their discretionary authority.

## A.    Officer Hall

In this case, Plaintiffs contend that Officer Hall violated Decedent's Fourth Amendment right to be free from excessive force.  "Any claim that a law enforcement officer used excessive force—whether deadly or not—during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009) (per curiam) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). Under this rule, a court must ask whether the force used was "'objectively reasonable in light of the facts confronting the officer.'" Brown v. Nocco, 788 F. App'x 669, 674 (11th Cir. 2019) (quoting Mobley v. Palm Beach Cnty. Sherriff Dep't, 783 F.3d 1347, 1353 (11th Cir. 2015)).  This determination is made "from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight." Mobley, 783 F.3d at 1353.  Significantly, the Supreme Court of the United States has recognized that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397.

Whether an officer's use of force is reasonable depends on a number of factors. Cantu v. City of Dothan, 974 F.3d 1217, 1229 (11th Cir. 2020).  These

factors include "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. In cases involving deadly force, courts should also consider whether the officer:

> (1) ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others or that he ha[d] committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believe[d] that the use of deadly force was necessary to prevent escape; *and* (3) ha[d] given some warning about the possible use of deadly force, if feasible.

Perez v. Suszczynski, 809 F.3d 1213, 1218–19 (11th Cir. 2016) (quoting Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013)). It is well settled that "[t]hese are not 'rigid preconditions' for the lawful application of deadly force, but rather factors" that courts should consider. Wright v. Warren, No. 23-13930, 2025 WL 1409296, at *4 (11th Cir. May 15, 2025). As explained by the Eleventh Circuit, "[n]ot all of the factors are relevant to all excessive force cases." Cantu, 974 F.3d at 1229. In fact, the Eleventh Circuit has held that in a typical case, "it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others." Id.; see Shaw v. City of Selma, 884 F.3d 1093–98 (11th Cir. 2018) (determining that qualified immunity was appropriate for an officer who

shot a mentally ill man who was holding a hatchet and advancing on the officer even though the man had not committed a crime, was not attempting to escape and was not aggressively resisting arrest).

The following factors weigh in favor of Plaintiffs: the severity of the crime at issue; whether Decedent was actively resisting arrest or attempting to evade arrest by flight; and whether the officer reasonably believed that the use of deadly force was necessary to prevent escape. As to the severity of the crime at issue, this factor weighs in Plaintiffs' favor because the only crime potentially committed by Decedent was trespass—a misdemeanor. The record shows that Decedent had gone into a building that was under construction and that the officers had responded to a 911 call about a "suspicious person." Under these facts, the Court cannot find that the underlying crime was serious. The other two factors—whether Decedent was actively resisting arrest or whether the use of force was necessary to prevent escape—also weigh, albeit minimally, in favor of Plaintiffs because there is no indication in the record that Decedent was ever under arrest[6] or trying to flee.

---

[6] Even though Decedent was not resisting arrest because no arrest was attempted, Decedent failed to follow multiple commands from the officers to stay away from the toolbox. As such, the Court weighs the factor only minimally in Plaintiffs' favor. The refusal to obey commands to drop a weapon may, in some circumstances, constitute resisting arrest. Penley v. Eslinger, 605 F.3d 843, 851 (11th Cir. 2010).

Even though the above factors weigh in favor of Plaintiffs, Eleventh Circuit law provides that an officer is still entitled to qualified immunity if the officer "had probable cause to believe at the time [he] shot [the decedent] he posed a threat of serious physical harm or death to one or more of the officers." Cantu, 974 F.3d at 1229–30 (stating that "in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer"). In determining whether an officer had probable cause to believe that the suspect posed a threat of serious physical harm to the officer or others, a court must look to the "level and immediacy" of the threat. Powell v. Snook, 25 F.4th 912, 922 (11th Cir. 2022) (noting that "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect"). This factor essentially asks a court to determine "whether, given the circumstances, the suspect would have appeared to reasonable police officers to have been gravely dangerous." Penley v. Eslinger, 605 F.3d 843, 851 (11th Cir. 2010) (alteration omitted).

Plaintiffs contend that Decedent did not pose a serious threat to Officer Hall or others.[7] The bodycam recordings, however, show that Officer Hall discharged

---

[7] In the Complaint, Plaintiffs offer a single conclusory allegation regarding whether Decedent posed a threat to officers: "At the time Officer Hall shot seven times striking [Decedent], he did not have an objectively reasonable basis to believe that [Decedent] posed an imminent threat of serious bodily injury or death to him or any other person."

his weapon only after Decedent ignored orders to stay away from the toolbox, grabbed a pair of construction scissors—a sharp, inherently dangerous object capable of causing fatal injury at close quarters—and began advancing towards Officer Hall with the weapon in his hand.  Given that Decedent was moving towards Officer Hall with the construction scissors while in a confined space, this Court finds that Decedent would have appeared to a reasonable police officer to be gravely dangerous.  As such, this factor—which the Eleventh Circuit has recognized can be the decisive factor—weighs in favor of a finding of immunity. See Shaw, 884 F.3d at 1099 ("The decisive [factor] here is the threat of physical harm that [the decedent] posed at the time he was shot.").

The Court acknowledges that courts should also analyze whether the officer gave some warning about the possible use of deadly force, if feasible.  Here, both officers told Decedent to stay away from the toolbox.  It is undisputed, however, that neither officer indicated that they would shoot Decedent if he did not comply with their instructions.  Because only seconds passed from the time Decedent

---

[Doc. 1, p. 29].  Missing from Plaintiffs' Complaint, however, are allegations of actual fact indicating that Decedent was non-threatening.  For instance, Plaintiffs do not allege that Decedent was unarmed or that he was compliant with any of the officer's commands or any other fact which would show that Decedent was not dangerous.  Moreover, in their response brief, Plaintiffs provide no factual detail or argument as to why Decedent did not pose a danger and simply cites the law that states that the presence of a "weapon is not enough to warrant the exercise of deadly force."  [Doc. 20, p. 18].

advanced on Officer Hall to the time of the shooting, the Court finds that it was not feasible for Officer Hall to issue a warning before shooting Decedent. Accordingly, this factor also weighs in favor of immunity.

In sum, after considering and weighing the relevant factors, the Court finds that Officer Halls's use of deadly force was objectively reasonable under the Fourth Amendment, especially in light of the threat of physical harm that Decedent posed to the officers. Therefore, Officer Hall is entitled to qualified immunity on Plaintiffs' federal claim, and to the extent that Defendants seek judgment on the pleadings on this basis, the motion is **GRANTED**.[8]

---

[8] Plaintiffs assert that Cantu, Mercado v. City of Orlando, 407 F.3d 1152 (11th Cir. 2005) and Teel v. Lozada, 826 F. App'x 880 (11th Cir. 2020) compel a different result. These cases, however, are distinguishable. In Cantu, the officer was not entitled to qualified immunity because a genuine issue of material fact existed as to whether the plaintiff had control of another police officer's taser and could have used it to take a service pistol. 974 F.3d at 1230. Here, the uncontroverted video evidence shows that Decedent had the construction scissors. In other words, no dispute exists as to whether Decedent had a weapon. Mercado—another case in which the court determined that the officer was not entitled to qualified immunity—is distinguishable because the plaintiff, who was holding a knife to his own chest, made no threatening moves towards the police. 407 F.3d at 1157. Unlike the plaintiff in Mercado, Decedent was moving towards Officer Hall with a weapon in his hand. In Teel, an officer was denied qualified immunity when he shot an individual holding a knife. 826 F. App'x at 886. The case is inapposite because the individual, who was diminutive in size, walked towards the police officer in a gradual manner, never picked up the pace or made any sudden movements. Id.

**B.    Officer Webber**

Plaintiffs contend that Officer Webber violated Decedent's constitutional rights by failing to intervene during Officer Hall's allegedly excessive and unreasonable force.[9]  In the Eleventh Circuit, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim [from] another officer's use of excessive force, can be held liable for his nonfeasance."  Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008).  Importantly, to be liable, the non-intervening officer must have "both the opportunity to intervene and be in a position to intervene yet fail to do so."  Johnson v. White, 725 F. App'x 868, 878 (11th Cir. 2018).  "Instances of force that occur within seconds do not place officers in a realistic position to intervene."  Id.

In this case, the bodycam recordings conclusively show that the entire incident (from initial contact until the shooting) lasted only twenty-five seconds. At the beginning of the encounter, the officers tried to speak to Decedent.  Then, the situation evolved rapidly when Decedent stood up, bent back down to grab the scissors and began moving towards Officer Hall with the scissors in his hand.  This

---

[9] Officer Webber prevails for the simple reason that Officer Hall's use of deadly force did not constitute excessive force.  See Crenshaw v. Lister, 556 F.3d 1283, 1294 (11th Cir. 2009) (explaining that there is "no attendant obligation to intervene" if the other officer's force is not excessive).  The Court nevertheless analyzes the entirety of Plaintiffs' claim against Officer Webber in an abundance of caution.

sequence of events occurred in just five seconds. The shooting portion lasted only two seconds. Given this tight timeline, no constitutional violation occurred here because Officer Webber, who was standing on the other side of the room, neither had an opportunity to intervene nor was he in a position to intervene. Specifically, Officer Webber did not have time to physically stop Officer Hall or issue a command directing Officer Hall to stop. Simply put, the event happened too quickly for Officer Webber to have intervened. Accordingly, Officer Webber is entitled to qualified immunity with respect to the failure to intervene claim, and to the extent that Defendants seek judgment on this basis, the motion is **GRANTED**. See Marantes v. Miami-Dade County, 649 F. App'x 665, 672 (11th Cir. 2016) (holding that an observing officer was entitled to qualified immunity when the use of force occurred "in rapid succession without warning" leaving no time to issue a verbal command or physically intervene); Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010) (finding no liability for the non-arresting officer because "the relevant events happened so quickly"); Bohanan v. Paulding County, 479 F. Supp. 3d 1345, 1362 (N.D. Ga. 2020) (holding that an observing officer was entitled to qualified immunity when "only a handful of seconds elapsed" before the other officer decided to fire his gun).

## II.    __Monell Claim__

Plaintiffs assert a __Monell__ claim against the City of Riverdale.  Essentially, Plaintiffs claim that "[b]y failing to adequately scrutinize Officer Hall's prior law enforcement background and failing to provide Officer Hall with adequate supervision and training, [the City of Riverdale] was deliberately indifferent to the obvious risk that Officer Hall would violate the constitutional rights of citizens." [Doc. 1, pp. 38–39].

To state a __Monell__ claim, a plaintiff must allege facts showing:  "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  __McDowell v. Brown__, 392 F.3d 1283, 1289 (11th Cir. 2016).  As explained in the sections above, neither Officer Hall nor Officer Webber committed a constitutional violation.  Because Decedent's constitutional rights were not violated, Plaintiffs cannot impose liability on the City of Riverdale under 42 U.S.C. § 1983.  __See__ __Johnson__, 107 F.4th at 1298 (holding that "because no constitutional violation occurred, [the plaintiff] cannot succeed on his __Monell__ claim against the City"); __see also__ __Miller v. Harget__, 458 F.3d 1251, 1261 (11th Cir. 2006) ("Because [the plaintiff] has failed to establish that his constitutional rights were violated, he has necessarily failed to establish the City's

liability.").  Accordingly, Defendants' motion is **GRANTED** to the extent that they seek judgment as to Plaintiffs' <u>Monell</u> claim.

## III.    State Law Claims

Plaintiffs bring an array of state law claims in this case, including claims for battery, intentional infliction of emotional distress and wrongful death.  These causes of action are before the Court pursuant to the Court's supplemental jurisdiction.  In accordance with 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction."  In assessing whether to retain supplemental jurisdiction, a court should consider the following factors: judicial economy, convenience, fairness and comity.  <u>West v. City of Albany</u>, 830 F. App'x 588, 597 (11th Cir. 2020).  Notably, the Eleventh Circuit has stated that in the usual case where all federal claims are dismissed before trial, the balance of the factors "will point toward declining to exercise jurisdiction over the remaining state-law claims."  <u>Vibe Micro, Inc. v. Shabanets</u>, 878 F.3d 1291, 1296 (11th Cir. 2018).  The Eleventh Circuit has even "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial."  <u>Raney v. Allstate Ins. Co.</u>, 370 F.3d 1086, 1088 (11th Cir. 2004).

In considering the first three factors (convenience, fairness and judicial economy), it is important to recognize that this case is still in a very early stage. If the Court were to decline to exercise jurisdiction now, inconvenience or unfairness to the parties would be virtually non-existent because the parties will not need to expend substantial additional resources to refile the matter in state court or refile the dismissal motion. As to the comity factor, the Court notes that "[r]esolution of Plaintiffs' state law claims depends on determinations of state law. State court, not federal courts, should be the final arbiters of state law." Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997). This principle—that Georgia state law claims are best resolved by Georgia courts—"is especially true . . . where the Court is dismissing Plaintiffs' federal law claim[s] prior to trial." Id. The comity consideration thus "decidedly weighs in favor of dismissal." Estate of Owens v. GEO Grp., 660 F. App'x 763, 775 (11th Cir. 2016).

After considering the factors, the Court declines to exercise supplemental jurisdiction over the remaining claims. Plaintiffs' state-law claims are thus **DISMISSED WITHOUT PREJUDICE**.[10] See Harris-Billups v. Anderson, 555

---

[10] "When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court." Ingram v. Sch. Bd. of Mia.-Dade Cnty., 167 F. App'x 107, 109 (11th Cir. 2006).

F. Supp. 3d 1328, 1343–44 (N.D. Ga. 2021) (declining to exercise supplemental jurisdiction over state law claims after finding that a police officer was entitled to qualified immunity).

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Judgment on the Pleadings [Doc. 13] is **GRANTED**.[11]  The federal claims are **DISMISSED WITH PREJUDICE**, and the state claims are **DISMISSED WITHOUT PREJUDICE**. The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 5th day of December, 2025.

**J. P. BOULEE**
United States District Judge

---

[11] Defendants' Motion to Stay Discovery [Doc. 14] is **DENIED** as moot.  The Court notes that Plaintiffs opposed the motion and asked the Court for permission to conduct discovery before the Court issued a ruling on the dispositive motion.  [Doc. 21].  Because the bodycam recordings establish that no constitutional violation occurred, this Court finds that discovery would be futile.